UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| HAROLD P. KEOGH, and | ) | Case No. 12-46330-705 |
| DEBRA A. KEOGH, | ) | Judge Kathy A. Surratt-States |
| | ) | Chapter 7 |
| Debtors. | ) | |
| | ) | |
| FLEMING MANUFACTURING | ) | **Adversary No. 12-4294-659** |
| COMPANY, INC., | ) | |
| | ) | **PUBLISHED** |
| Plaintiff, | ) | |
| | ) | |
| -v- | ) | |
| | ) | |
| HAROLD P. KEOGH, and | ) | |
| DEBRA A. KEOGH, | ) | |
| | ) | |
| Defendants. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The matters before the Court are Amended and Restated Complaint for Determinaiton [sic]

of Dischargeability of Debt or, In The Alternative, Denial of Discharge,[1] Answer to Amended and

Restated Complaint for Determination of Dischargeability of Debt or, in the Alternative, Denial of

Discharge, Movant/Plaintiff's Proposed Findings of Fact, Conclusions of Law and Judgment,

Movant/Plaintiff's Trial Brief, Defendants['] Proposed Findings of Fact and Conclusions of Law, Joint

Stipulation of Facts, Movant/Plaintiff Fleming Manufacturing Company, Inc.'s [Motion for] Taxation

of Costs, Plaintiff's Motion for Leave of Court to File Supplemental Legal Memorandum and Motion

to Amend Its Proposed Findings of Fact, Conclusions of Law and Judgment by Interlineation,

---

[1]By Stipulated Order entered by this Court on February 8, 2013, Plaintiff Fleming Manufacturing
Company, Inc., was granted permission to file the Amended and Restated Complaint for Determinaiton [sic]
of Dischargeability of Debt or, In The Alternative, Denial of Discharge.  Plaintiff Fleming
Manufacturing Company, Inc. previously filed Complaint for Determination of Dischargeability of Debt or,
In The Alternative, Denial of Discharge and Defendants Debra A. Keough and Harold P. Keough filed
Amended Answer to Complaint for Determination of Dischargeability of Debt or, In The Alternative, Denial
of Discharge.

Plaintiff's Supplemental Legal Memorandum and Motion to Amend Its Proposed Findings of Fact, Conclusions of Law and Judgment by Interlineation and Plaintiff's Submission of Attorneys Fees and Costs.  A trial was held on February 12, 2013, March 21, 2013 and June 11, 2013, at which Debtors Debra A. Keough and Harold P. Keough appeared in person and by counsel and Plaintiff Fleming Manufacturing Company, Inc. was represented by counsel.  Testimony and evidence were presented and the matters were taken under submission.  Upon consideration of the record as a whole, the Court issues the following **FINDINGS OF FACT:**

Debtors Debra A. Keough and Harold P. Keough (hereinafter collectively "Debtors") filed a Joint Petition under Chapter 7 of the Bankruptcy Code on June 29, 2012.  On August 11, 2012, Chapter 7 Trustee Stuart Radloff filed his Report of No Distribution and on October 10, 2012, Debtors received a discharge under Section 727.  Plaintiff Fleming Manufacturing Company, Inc. (hereinafter "Fleming") now requests that this Court determine that certain debts be excepted from Debtors' discharge or alternatively that this Court revoke Debtors' discharge.[2]

Fleming is a Missouri corporation with its principal place of business in St. James, Missouri. Fleming manufactures and services industrial machinery used in the production of concrete products.  Fleming was once owned by Bill Fleming.  Bill Fleming sold Fleming to Eagle Building Technologies, Inc. (hereinafter "Eagle").  By separate agreement that was not disclosed to this Court, Bill Fleming was to receive continued payments from Fleming after Eagle assumed ownership of Fleming.  Eagle owned Fleming from January 2001 through October 2008.  Fleming is now owned by Steve Levy (hereinafter "Mr. Levy").

Debtor Debra A. Keogh (hereinafter "Ms. Keogh") was hired in September 1988 as the personal secretary of the former owner of Fleming, Bill Fleming.  On or about August 15, 2000, Ms. Keogh became a Sales Person for Fleming.  Her salary at that time was between $33,500.00 and

---

[2]As will be discussed below, Plaintiff did not prosecute the request to revoke Debtors' discharge and likely intended to withdraw this request.

$40,000.00.[3]  At some point before July 30, 2002, Ms. Keogh became the General Manager of Fleming.

On or about July 30, 2002, Ms. Keogh was informed that she would soon be paid an annual salary of $100,000.00.[4]  No later than January 1, 2003, Ms. Keogh became the President of Fleming[5] and her compensation at the $100,000.00 per year rate began.  Ms. Keogh also served on the Board of Eagle in 2003.

As President of Fleming, Ms. Keogh had control over Fleming's revenue and working capital.  Ms. Keogh was also in charge of Fleming's general operations, administrative sales and financial affairs in that Ms. Keogh managed Fleming's accounts payable and receivable, managed and had signatory authority on all of Fleming's bank accounts and had authority to open and close bank accounts, arrange safety deposit boxes and secure other banking services.  Ms. Keogh established a $300,000.00 revolving line of credit with Bank of Sullivan on behalf of Fleming which Ms. Keogh used in connection with Fleming's operations.  Ms. Keogh was further authorized to sign checks on an account established by Eagle as a supplement to Fleming's regular bank accounts.  Ms. Keogh was also in charge of Fleming's human resources in that she had authority to hire, fire, retain and promote staff.  Ms. Keogh was also responsible for making the aforementioned payments to Bill Fleming.

Fleming began to experience financial difficulties as late as 2002.  Fleming's major financial issues were caused by Internal Revenue Service (hereinafter "IRS") delinquencies, its bank obligations to Bank of Sullivan and its payment obligations to Bill Fleming.  Fleming also had weekly payroll obligations to satisfy.  Fleming also financed certain ventures on behalf of Eagle.  Ms. Keogh grew frustrated with the pressures to meet Fleming's several financial obligations which ultimately

---

[3]Pl. Ex. 3.

[4]Def. Ex. M.

[5]Pl. Ex. 33.

conflicted with Ms. Keogh's personal ideas on how she wanted to operate Fleming. As a result, Ms. Keogh made a series of poor decisions which are summarized as follows.

Ms. Keogh hired her family members: her daughter Mackenzie Keogh (hereinafter "Daughter Mackenzie"), her son Stephen Keogh (hereinafter "Son Stephen"), on occasion her father Melvin Kamler (hereinafter "Mr. Kamler"), her brother Matthew Kamler, Debtor Harold P. Keogh (hereinafter "Mr. Keogh"), and her son's then-girlfriend and mother of one of Debtors' grandchildren Jennifer Cunningham (hereinafter "Ms. Cunningham"). Ms. Keogh authorized salaries for certain family members which were based on time sheets that were either falsified by Ms. Keogh or which Ms. Keogh authorized with knowledge of the falsity of the time sheets. She also caused Mr. Keogh to be paid for cleaning services which were not provided. Ms. Keogh also caused Fleming checks to be made to cash, which she would use for personal purposes and would co-mingle with her personal funds. Ms. Keogh also alleged to Eagle that certain funds were needed to satisfy certain Fleming debt, particularly that owed to the Bank of Sullivan and to the IRS, however, though Ms. Keogh was granted the necessary funds to make the payments, there are either no records of receipt of payments Ms. Keogh alleged to have made or no records of receipt of payments around the time Ms. Keogh alleged the need for funds to make those payments. Ms. Keogh also decided to issue herself and her family members checks in various amounts at various times in alleged satisfaction of commissions to which she claimed to be entitled.

Ms. Keogh took loans on behalf of Fleming from her father Mr. Kamler and ultimately caused repayment to Mr. Kamler to be granted priority over Fleming's other creditors. Finally, Ms. Keogh decided to leave Fleming and start her own company, first Innovative Manufacturing Concepts (hereinafter "Innovative") and then, after Innovative failed, International Molds Company (hereinafter "IMC"), which she formed using Fleming's proprietary technical drawings. Ms. Keogh misappropriated three (3) Lomega External Hard Drives which contained Fleming's proprietary technical drawings and customer list and used the same at Innovative and IMC. Ms. Keogh also

-4-

caused prints of Fleming's technical drawings to be made, and/or took prints of those drawings from Fleming. Fleming's technical drawings bore the name "Fleming" on them, which Ms. Keogh manually removed or caused to be manually removed, and then superimposed the name "IMC." Each of Fleming's drawings also contained a corresponding Fleming catalogue number which was not changed or altered by Ms. Keogh.

In support of the above, Fleming presented numerous documents and the testimony of Ms. Cunningham, Dustin Ungar (hereinafter "Mr. Ungar"), Deputy Sheriff Mike Templeton (hereinafter "Deputy Sheriff Templeton"), Cuba Police Chief Paul Crow (hereinafter "Chief Crow") and Mr. Levy. In defense, Debtors both testified, as did Mr. Kamler.

Ms. Cunningham began working at Fleming in mid-2002 at age 16 as a receptionist. At that time, Ms. Cunningham was Son Stephen's pregnant girlfriend. Ms. Cunningham worked full-time over the 2002 Christmas season but began to work part-time from 3:30pm to 5:30pm in January 2003 because she resumed her high school studies. Ms. Cunningham's January 2003 time sheets however reflect work of 40 to 50 hours per week, and she received wages at $8.00 per hour, plus overtime, based on those fallacious time sheets.[6] No deductions for taxes, medicare or other customary deductions were taken from any of Ms. Cunningham's paychecks.

Ms. Cunningham and Son Stephen's baby was born in February 2003. Ms. Cunningham testified that she did not work at all in February of 2003 though her time records and pay received from Fleming in February 2003 indicate that she worked at least 40 hours per week. The respective time sheets were either filled out by Ms. Cunningham at Ms. Keogh's direction and approved by Ms. Keogh, were filled out by Son Stephen at Ms. Keogh's direction and approved by Ms. Keogh or were filled out and approved by Ms. Keogh. All paychecks to Ms. Cunningham were issued by Ms. Keogh.

_____

[6]Pl. Ex. 19.

Ms. Cunningham graduated from high school in May 2004 and around that same time, she left Fleming. No W-2 or Form 1099 was ever issued to Ms. Cunningham for the wages she received. Ms. Cunningham does not appear on any employee records,[7] Fleming's 2003 payroll check register,[8] or Fleming's 2003 W-2 report.[9] Ms. Keogh testified that she believes Ms. Cunningham was paid for work performed or that payment made was for Ms. Cunningham's maternity leave.

Ms. Keogh also hired Son Stephen who initially worked in the stock room to become familiar with Fleming's inventory. Ms. Keogh intended for Son Stephen to become a purchasing agent to relieve Daughter Mackenzie who did job order entry and purchasing. Through 2003, Son Stephen was paid for 40 to 55 hours of work at a rate of $8.00 per hour, plus overtime. Son Stephen however worked primarily in a lawn care business during the spring and summer of 2003 and therefore could not have worked at Fleming for the hours reported on his time sheets which are correspondingly the hours for which he got paid.[10] Son Stephen was also at times paid more than once in a week.

Mr. Keogh started working for Fleming sometime in 2002 or 2003 as a contract employee. He was primarily Fleming's driver in that he would transport various machine parts and would help to maintain Fleming's two (2) trucks. Mr. Keogh also testified that he was contracted to clean Fleming's offices at $480.00 per week though he was uncertain as to the terms of his cleaning duties. Ms. Keogh testified that he was contracted in 2002 to clean the Fleming offices three (3) times per week for $480.00 per week and admits that the offices were not cleaned as required in 2003. Mr. Keogh believes that the funds he received from Fleming accurately reflects payment for

---

[7]Pl. Ex. 20; Pl. Ex. 38.

[8]Pl. Ex. 44.

[9]Pl. Ex. 45.

[10]Pl. Ex. 17.

the services he provided to Fleming, whether or not there are corresponding time sheets.[11]

Mr. Keogh stopped working for Fleming towards the end of 2003. Mr. Keogh does not appear on any employee records,[12] Fleming's 2003 payroll check register[13] or Fleming's 2003 W-2 report.[14] Mr. Keogh did not claim any of the funds received from Fleming as income on Debtors' jointly filed 2003 income tax return.[15]

Upon request by Ms. Keogh, her father Mr. Kamler loaned funds to Fleming on various occasions. Mr. Kamler loaned Fleming $10,000.00 through Check Number 9688 dated April 4, 2003 in the amount of $5,000.00 and Check Number 9689 dated April 4, 2003, in the amount of $5,000.00.[16] Mr. Kamler testified that he took out a personal loan of $10,000.00 which was secured by his home to make this loan to Fleming. The funds from this $10,000.00 loan were used by Ms. Keogh to meet Fleming's payroll obligations. Mr. Kamler also made a $8,000.00 payment to the IRS on Fleming's behalf with Check Number 3992 dated September 3, 2003.[17]

Mr. Kamler received Check Number 240 dated April 29, 2003 in the amount of $1,700.00 allegedly for interest on the $10,000.00 loan made a mere 25 days earlier. Mr. Kamler testified that he believes that part of the $1,700.00 might have been to reimburse him for lunches and barbeques that he threw on Fleming's behalf to entertain clients. Mr. Kamler also received $2,000.00 in cash,[18]

---

[11]Pl. Ex. 18; Pl. Ex. 39.

[12]Pl. Ex. 20; Pl. Ex. 38.

[13]Pl. Ex. 44.

[14]Pl. Ex. 45.

[15]Pl. Ex. 46.

[16]Def. Ex. L.

[17] Pl. Ex. 43.

[18]The notes on Check Number 52160 dated September 29, 2003 in the amount of $2,000.00, payable to cash, indicate that the proceeds were to make a cashier's check payable to "Melvin Kamler - Partial Repayment on Loan." Pl. Ex. 43.

and the proceeds of Check Number 52167 dated September 3, 2003 in the amount of $8,000.00 which were made to cash. As will be discussed below, Mr. Kamler also received distributions in Fleming's Chapter 11 case.

Ms. Keogh also developed a cash payroll system. First, Ms. Keogh would either go to the bank in person or she would instruct a Fleming employee who was not a signatory of Fleming's bank accounts to withdraw funds. Second, Ms. Keogh would give the Fleming employees payroll checks which the employees would endorse and return to Ms. Keogh. Third, Ms. Keogh would give the employees their pay in cash from the funds she either withdrew or caused to be withdrawn from Fleming's bank accounts.[19] Ms. Keogh testified that she implemented this cash-payment payroll system to avoid the risk that between the issuance of payroll checks and the date the checks are cashed, the IRS would have levied on Fleming's account and therefore disable Fleming from meeting its payroll obligations.[20]

Ms. Keogh also testified that as a result of her fear of an IRS levy, for a time, she carried Fleming's funds on her person but ultimately she opened a Safety Deposit Box[21] in which she put most of Fleming's funds. Ms. Keogh further testified that she had on occasion put funds into her personal account to ensure access to Fleming's funds. Any amount sought in cash that was above the amount needed for payroll remains unaccounted.

Ms. Keogh also used a cash system for Fleming obligations beyond payroll. Mr. Ungar worked at Fleming in 2003 as a draftsman in that Mr. Ungar drew technical drawings of molds for

---

[19]Mr. Ungar testified that Ms. Keogh gave Fleming employees payroll checks which they would endorse and give back to Ms. Keogh at which time she would use the cash obtained at Ms. Keogh's instructions by Mr. Ungar to cash the employees' payroll check.

[20]Mr. Ungar testified that Ms. Keogh stated that the bank was going to freeze Fleming's bank account and therefore payroll needed to be paid in cash, weekly. Mr. Ungar testified that he did not know whether there was any truth to Ms. Keogh's statement but that he believed her representations at the time.

[21]Pl. Ex. 8.

Fleming.  Ms. Keogh gave Mr. Ungar Union Planters Bank Check Number 37552 dated April 18, 2003 payable to Fleming in the amount of $65,000.00 and asked him to cash it.[22]  Mr. Ungar endorsed and cashed the check at Union Planters Bank in Rolla, Missouri and brought the funds back to Ms. Keogh.  Mr. Ungar was not an authorized signatory on any Fleming account.  Notations on Check Number 37552 indicate that the funds were used to pay $27,000.00 to Bill Fleming, $25,000.00 to Milt of Bank of Sullivan which was also a creditor of Fleming, and $13,000.00 in payroll, through there is no other evidence to corroborate that these funds were applied as indicated.  Specifically, Fleming presented the Court with its leger to Bank of Sullivan which does not show a $25,000.00 payment on or around the time that Check Number 37552 was cashed.[23] Ms. Keogh testified that she believes that Bank of Sullivan got some of those funds, though she admits that Bank of Sullivan did not receive the entire $25,000.00.

Mr. Ungar was also asked by Ms. Keogh to cash Union Planters Bank Check Number 37952 dated June 27, 2003 in the amount of $25,000.00, which he endorsed, negotiated and brought the cash to Ms. Keogh.[24]  Mr. Ungar was also asked by Ms. Keogh to cash Union Planters Bank Check Number 38024 dated November 20, 2003 in the amount of $8,000.00 which he endorsed, cashed and brought the cash to Ms. Keogh.[25]  Mr. Ungar testified that he does not know how Ms. Keogh used these funds.

Check Number 38278 dated January 2, 2004 was made payable to Mr. Ungar in the amount of $3,260.67.[26]  Mr. Ungar testified that as before, he cashed this check and brought the funds to

_____

[22]Union Planters Bank was acquired by Regions Financial Corporation.

[23]Pl. Ex. 8.

[24]Pl. Ex. 14.

[25]Pl. Ex. 14.

[26]Pl. Ex. 15.

Ms. Keogh and she divided the cash between herself, Mr. Ungar, Son Stephen who appears to have been paid $602.50 of these funds and Ms. Cunningham appears to have been paid $320.00.[27]

Similarly, Check Number 38255 dated December 5, 2003 was made payable to Mr. Ungar in the amount of $1,937.75 which Mr. Ungar testified that he cashed, brought the funds to Ms. Keogh and does not know what was done with these funds. The notations on Check Number 38255 indicate that Son Stephen was paid $602.50 and an employee named Lee Cushing was paid $731.25. Mr. Ungar also testified that he needed to use his personal credit card at times and was reimbursed for these expenditures, as well as for his mileage whenever he needed to use his personal vehicle to run errands on behalf of Fleming. To be reimbursed, Mr. Ungar would write down his expenses and Ms. Keogh would reimburse him either in cash or by check.

Check Number 37090 dated October 21, 2003 in the amount of $8,000.00 was negotiated to cash by Ms. Keogh. Ms. Keogh alleges that she used these funds to make a payment to the IRS, however, this Court's review of the Fleming IRS transcripts[28] reflects no corresponding payment received and therefore these funds remain unaccounted.

Also in 2003, Ms. Keogh decided that she would issue herself commissions in random amounts at various times through various means. Specifically, Ms. Keough caused Check Number 37169, dated July 23, 2003 to be made payable to cash in the amount of $14,800.00.[29] Check Number 37169 was endorsed by Daughter Mackenzie and thereafter, at Ms. Keogh's direction, a cashier's check was issued in favor of Jason Pfeiffer, then-boyfriend of Daughter Mackenzie. Those funds were used to finance a down payment on a home for Daughter Mackenzie and Jason Pfeiffer. Ms. Keogh testified that she believed that she was entitled to those funds as commissions

---

[27]Pl. Ex. 15.

[28]Pl. Ex. 12.

[29]Pl. Ex. 6.

and/or past-due vacation pay.

Several other checks were made payable to Daughter Mackenzie, but were apparently issued as alleged payment for commissions due to Ms. Keogh. Check Number 37914 dated June 27, 2003 in the amount of $3,000.00 was made payable to Daughter Mackenzie for which the notes state "for Debra Keogh - Commission."[30] Also, Check Number 37998 dated July 9, 2003 in the amount of $2,580.00 payable to Daughter Mackenzie for which the notes state "for Debra Keogh - Commission."[31]

Fleming did not enter into an employment agreement with Ms. Keogh when she became President. The only employment agreement between Fleming and Ms. Keogh was executed when she was a Sales Person, and this employment agreement makes no mention of commissions.[32] Likewise, there is no document that specifically outlines Ms. Keogh's duties as President of Fleming. Rather, the only document that speaks to employee duties to Fleming is Fleming's Employee Handbook.[33]

Mr. Levy testified that in the middle of 2005 he spoke to Ms. Keogh about commissions. At that time, Ms. Keogh made a plea to him for commissions because of all the work she was doing to bring in new accounts. Mr. Levy testified that as of May or June of 2005, he began to pay Ms. Keogh a commission of one percent (1%) of revenue based upon Ms. Keogh's representation that when Bill Fleming owned Fleming, she received a commission. Ms. Keogh testified that she believed she was entitled to all commissions she received and states that in 2003, nothing was done by the book.

Fleming filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code on January 30,

---

[30]Pl. Ex. 9.

[31]Pl. Ex. 9.

[32]Pl. Ex. 3.

[33]Pl. Ex. 24.

2004 in the Southern District of Florida.  Mr. Levy became the owner and sole shareholder of Fleming after the confirmed Chapter 11 Plan called for all shares in Fleming held by Eagle to be directed to Mr. Levy.  Mr. Kamler filed claims in Fleming's Chapter 11 case, and it is undisputed that Mr. Kamler received distributions pursuant to Fleming's confirmed Chapter 11 Plan in the amounts of $3,000.00 on December 31, 2004 and $3,800.00 on May 5, 2005.[34]  At that time, Ms. Keogh was still the President of Fleming and she was not suspected of any wrongdoing until October 2006 when she resigned.

When Ms. Keogh resigned from Fleming, she immediately formed a competing company called Innovative Manufacturing Concepts (hereinafter "Innovative").  Ms. Keogh owned Innovative with an individual named Wynn Westmoreland.[35]  Shortly thereafter, Innovative was dissolved and International Molds Corporation (hereinafter "IMC") was formed.[36]  Mr. Keogh was the President of IMC and Ms. Keogh was Treasurer.  Mr. Keogh testified that this title was illusory[37] and that Ms. Keogh operated IMC.

Ms. Keogh took several of Fleming's proprietary technical drawings, as well as three (3) Lomega External Hard Drives which contained Fleming drawings, as well as Fleming's customer list.  The Lomegas were backed-up frequently and therefore contained Fleming's current catalogue of technical drawings and customer list.  Ms. Keogh used the technical drawings contained on the Lomegas at her companies, Innovative and IMC.  On occasion, Ms. Keogh physically removed Fleming's name from the prints of the technical drawings and superimposed the name "IMC."  Mr. Ungar testified that he witnessed Ms. Keogh physically remove the name "Fleming" from certain technical drawings with liquid paper or she would superimpose a small piece of white paper over

---

[34]Pl. Ex. 43.

[35]Pl. Ex. 34.

[36]Pl. Ex. 35.

[37]  Mr. Keogh testified that he might have received $500.00 from IMC.

the "Fleming" name and replace it with "IMC." Mr. Ungar also admits that he changed the name of certain drawings from Fleming to IMC at Ms. Keogh's direction, but the Fleming catalogue numbers which were also located on the drawings were not changed.

Ms. Keogh also caused her employees at Innovative and IMC, many of which were former Fleming employees, to use Fleming's technical drawings in performance of their duties. Specifically, Mr. Ungar testified that he left Fleming to work as a draftsman of molds at Innovative and then IMC. Mr. Ungar testified that all the computer drawings that he did on Fleming computers were made available to him and he would use those drawings which were stored on the Lomegas to perform some of his duties at Innovative and IMC. Mr. Ungar testified that it would take him more than his lifetime to reproduce the technical drawings that were contained on the Lomegas.

Mr. Levy testified that the cost for each mold design is approximately $4,000.00 calculated at three (3) to four (4) weeks of work at $1,000.00 per week. Mr. Levy testified that when Ms. Keogh misappropriated the Lomegas, they contained 1398 mold products which are sets of technical drawings to make molds. At a cost of $4,000.00 per mold product, Mr. Levy asserts damages of $5,592,000.00. Mr. Levy believes a willing buyer would have paid $750,000.00 for the mold product technical drawings. On Fleming's Schedule B, it listed its Drawings/Blueprints/Trade Secrets and Equipment at a value of $1,000,000.00 on Line 21[38].

Ultimately, Mr. Levy learned that Ms. Keogh had both electronic and physical copies of Fleming's technical drawings of molds. Mr. Levy then sought to recover Fleming's property in replevin. During the attempted recovery, Ms. Keogh was absent but Mr. Ungar was present. Mr. Ungar was instructed by Ms. Keogh not to let Mr. Levy leave with drawings and so, Mr. Ungar physically blocked Mr. Levy's passage way and ultimately, Mr. Ungar was arrested.

Deputy Sheriff Templeton of Crawford County, Missouri executed the replevin order and

---

[38] Pl. Ex. 2.

testified that he saw some technical drawings on a wire rack at Ms. Keogh's place of business. Those technical drawings were seized and given to Mr. Levy. Ultimately, the drawings that were seized became part of a separate criminal matter against Ms. Keogh.

A search warrant was also executed on Ms. Keogh's home, lead by Chief Crow. Chief Crow has been a police officer in Cuba, Missouri for 21 years and has been the Chief for over one (1) year. Chief Crow testified that he seized several drawings which he found in the front passenger seat of an inoperable vehicle located at Ms. Keogh's residence. Most of the technical drawings bore the name "Fleming" and included the following disclaimer: "The information contained in this drawing is the sole property of Fleming Manufacturing Co. Any reproduction in part or whole without the written permission of Fleming Manufacturing Co. is prohibited." Chief Crow ultimately held both the replevin drawings and the drawings obtained by the search warrant.[39] Each of the drawings obtained through the replevin or through the search warrant contain identification numbers which correspond to Fleming's catalogue of technical drawings. Chief Crow also found some Fleming payroll records in the inoperable vehicle, as well as stock certificates in the name of Mr. Keogh for two million (2,000,000) shares in Innovative.

Fleming received $170,000.00 for its loss caused by Ms. Keogh upon settlement with its insurance company, Atlantic Specialty Insurance Company, for Fleming's monetary losses. Fleming did not file an insurance claim for the theft of the technical drawings. Atlantic Specialty Insurance Company, Atlantic Mutual Insurance Company and Once Beacon Insurance Group, Ltd., its successors in interest have assigned to Fleming all their right, title and interest in any and all of their claims and causes of action under their insurance contracts with Fleming, including but not limited to the causes of action they have, had or may have for indemnity and/or contribution and/or

---

[39] Pl. Ex. 22A; Pl. Ex. 22B. The documents contained in Pl. Ex. 22B were received by Chief Crow from Deputy Sheriff Templeton after those documents were first temporarily in the custody of Mr. Levy.

-14-

subrogation.[40]

Fleming argues that it is entitled to damages of $224,559.95 for misappropriated funds and $750,000.00 due to misappropriation of Fleming drawings. Fleming argues that the culmination of Ms. Keogh's actions have caused Fleming substantial financial harm and this debt should be declared nondischargeable by this Court. Fleming also argues that Mr. Keogh benefitted greatly from Ms. Keogh's actions and therefore the debt determined by this Court should likewise be deemed nondischargeable as to Debtors, jointly. Fleming also requests taxation of costs and attorney's fees.

Ms. Keogh argues that she did her best to keep Fleming afloat and that all payments were made for work performed. Ms. Keogh admits that nothing was done by the book in 2003, however, she insists that she was not given much direction and therefore made the best decisions she could to honor her duties to Fleming, Fleming's creditors and employees. Ms. Keogh ask that Fleming's requests be denied.

## JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding under 28 U.S.C. §§ 151, 157, and 1334 (2012) and Local Rule 81-9.01(B) of the United States District Court for the Eastern District of Missouri. This is a core proceeding under 28 U.S.C. §157(b)(2)(A), (I) and (J) (2012). Venue is proper in this District under 28 U.S.C. § 1409(a) (2012).

## CONCLUSIONS OF LAW

The Court must determine whether the debt owed by Ms. Keogh to Fleming should be excepted from discharge. Fleming brings forth claims under Sections 523(a)(2)(A), (a)(2)(B), (a)(4) and (a)(6). The Court addresses each Count in turn.

---

[40]Pl. Ex. 4.

**COUNT I - Section 523(a)(2)(A)**

Under Section 523(a)(2), a debtor cannot obtain a discharge from any debt "for money, property, services…to the extent obtained by – false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A) (2008).  To establish fraud pursuant to Section 523(a)(2)(A), a creditor must prove the following elements by a preponderance of the evidence:

1. The debtor made a representation.
2. The debtor knew the representation was false at the time it was made.
3. The representation was deliberately made for the purpose of deceiving a creditor.
4. The creditor justifiably relied on the representation.
5. The creditor sustained the alleged loss as the proximate result of the representation having been made.

*In re Maurer*, 256 B.R. 495, 500 (B.A.P. 8th Cir. 2000).

Whether a creditor justifiably relies on a representation depends on the "qualities and characteristics of the particular [creditor], and the circumstances of the particular case." *Field v. Mans,* 516 U.S. 59, 71, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995) (discussing § 540 of the Restatement (Second) of Torts (1976) and stating that a creditor's reliance on a false statement is justifiable even when the creditor might have ascertained the falsity of the representation had the creditor investigated).  A plaintiff is still "'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination and investigation'" *Id.* (quoting Restatement (Second) of Torts § 541 cmt. a (1976)).  "Thus, a plaintiff who disregards red flags will not be able to satisfy the justifiable reliance standard." *In re Casper,* 466 B.R. 786, 794 (Bankr. M.D. N.C. 2012) (citing *Giovanni v. Grayson, Kubli, & Hoffman (In re Giovanni),* 324 B.R. 586, 594 (E.D. Va. 2005) (citation omitted)).

-16-

There were several misrepresentations made by Ms. Keogh, as well as representations that were in effect *true* due to certain improper or illegal actions taken by Ms. Keogh which caused those representations to be true.   Fleming, however, has not demonstrated how Ms. Keogh made misrepresentations to obtain funds from Fleming for which Ms. Keogh would immediately be indebted to Fleming.  An example of such an action would be a personal loan.  Ms. Keogh made a series of poor decisions for which she must now answer.  There were several red flags that should have reasonably signaled to Eagle that there were dire financial issues at Fleming.  Ms. Keogh's actions are not tailored to an action under Section 523(a)(2)(A), and therefore, the relief requested under Count I will be denied.

**COUNT II - 523(a)(2)(B)**

Under Section 523(a)(2)(B), any debt obtained for "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by use of a statement in writing (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive" will be excepted from discharge. 11 U.S.C. § 523(a)(2)(B) (2012); *In re Binns,* 328 B.R. 126, 130 (B.A.P. 8th Cir. 2005).  For purposes of Section 523(a)(2)(B), a statement is materially false if it "paints a substantially untruthful picture of a debtor's financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *In re Bohr,* 271 B.R. 162, 167 (Bankr. W.D. Mo. 2001); *In re Capelli,* 261 B.R. 81, 90 (Bankr. D. Conn. 2001). To satisfy the materially false writing requirement of Section 523(a)(2)(B), the written statement need not be physically prepared by a debtor.  *In re Braathen,* 364 B.R. 688, 700 (Bankr. D.N.D. 2006) (citing *Fairfax State Sav. Bank v. McCleary (In re McCleary),* 284 B.R. 876, 885 (Bankr. N.D. Iowa 2002)). "The writing requirement is satisfied if the written statement was signed, adopted and used, or

caused to be prepared by the debtor." *Id.; In re Hambley,* 329 B.R. 382, 399 (Bankr. E.D.N.Y. 2005).

The plaintiff must demonstrate both that it actually relied upon the false financial statement and that its reliance was reasonable under the circumstances. *Teachers Credit Union v. Johnson (In re Johnson),* 131 B.R. 848, 854 (Bankr. W.D. Mo.1991). The reasonableness of the creditor's reliance on the financial statement is based on an assessment of the totality of the circumstances. *First Nat. Bank of Olathe, Kan. v. Pontow (In re Pontow),* 111 F.3d 604, 610 (8th Cir.1997); *In re Ghere,* 393 B.R. 209, 216 (Bankr. W.D. Mo.2008); *In re Bohr,* 271 B.R. at 168. The court may consider if there were any "red flags" that would have alerted the creditor to the possibility that the financial statement was not accurate and whether minimal investigation would have revealed the inaccuracy. *In re Pontow,* 111 F.3d at 610 (citing *In re Coston,* 991 F.2d 257, 261 (5th Cir.1993) (en banc)).

The debtor may have produced a statement with intent to deceive without having a malignant heart; actual malice is not required. *In re Webb,* 256 B.R. 292, 297 (Bankr. E.D. Ark. 2000); *In re Ghere,* 393 B.R. at 215; *In re Bohr,* 271 B.R. at 169. A creditor may establish intent to deceive by proving that debtor knew the statement was false or that debtor acted with reckless indifference to or reckless disregard of the accuracy of the information in a debtor's financial statement. *In re McCleary,* 284 B.R. at 888; *In re Ghere,* 393 B.R. at 215; *In re Bohr,* 271 B.R. at 169. Because direct evidence of such intent is often absent, it may be inferred from the circumstances. *In re Ghere,* 393 B.R. at 215. The debtor cannot overcome an inference of intent to deceive merely with unsupported assertions of honest intent. *In re Ghere,* 393 B.R. at 215; *In re Bohr,* 271 B.R. at 169.

Again, like the action brought under Section 523(a)(2)(A), the argument that Ms. Keogh presented false statements in writing in order to obtain credit from Fleming mischaracterizes the nature of Ms. Keogh's actions. A suit brought under Section 523(a)(2)(B) is ordinarily implicated

-18-

where a debtor submits false documents to a creditor to obtain credit or a loan from that creditor. This is not the case here. Fleming has not presented a theory under which Ms. Keogh's actions merit consideration under Section 523(a)(2)(B) because Ms. Keogh did not obtain a debt from Fleming based on a materially false writing. The relief requested in Count II will be denied.

**COUNT III - 523(a)(4)**

Under Section 523(a)(4), a debt owed for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny is excepted from discharge. *See* 11 U.S.C. § 523(a)(4) (2012). The Court will first discuss debts for fraud or defalcation while acting in a fiduciary capacity, followed by a discussion on embezzlement and then larceny.

<u>Fraud or Defalcation While Acting in a Fiduciary Capacity</u>

Exception from discharge for defalcation in breach of fiduciary duty under Section 523(a)(4) requires a showing of two elements: (1) the existence of a fiduciary relationship between the debtor and the objecting party and (2) a defalcation committed by the debtor in the course of that fiduciary relationship. *See Jafarpour v. Shahrokhi (In re Shahrokhi),* 266 B.R. 702, 707 (B.A.P. 8th Cir. 2001). "[T]he broad, general definition of fiduciary – a relationship involving confidence, trust and good faith – is inapplicable in the dischargeability context." *In re Thompson,* 458 B.R. 504, 508 (B.A.P. 8th Cir. 2011) (citing *Cal-Micro, Inc., v. Cantrell (In re Cantrell),* 329 F.3d 1119, 1125 (9th Cir. 2003) (citation omitted)). In the context of Section 523(a)(4), the fiduciary relationship must preexist "the incident creating the contested debt and [derive] from it. It is not enough that the trust relationship spring from the act from which the debt arose." *Matter of Dloogoff,* 600 F.2d 166, 168 (8th Cir. 1979)*; Hunter v. Philpott,* 373 F.3d 873, 875–877 (8th Cir.2004); *In re Cochrane,* 124 F.3d 978, 984 (8th Cir. 1997); *Werner v. Hofmann,* 5 F.3d 1170, 1172 (8th Cir. 1993); *see In re Shahrokhi,* 266 B.R. at 707-708. The duty must have run directly from the debtor to the creditor, prior to the acts complained *of. In re Dloogoff,* 600 F.2d at 169–170.

There must be an "express trust," or a "technical trust" whereby a set of legally-imposed duties to avoid self-dealing under an objectively-manifested, preexisting and binding relationship are strictly defined.  An express trust is "[a] trust created with the settlor's express intent, usu[ally] declared in writing." Black's Law Dictionary 1650 (9th ed. 2009).  A technical trust is one created by state statute or common law or by contract.  *In re Thompson,* 686 F.3d 940, 944 (8th Cir. 2012) (citing *In re Long,* 774 F.2d at 878); *see also In re Bennett,* 989 F.2d 779, 784–785 (5th Cir.1993) (trust requirement of § 523(a)(4) may be satisfied by "relationships in which trust-type obligations are imposed pursuant to statute or common law").

"Whether a relationship is a 'fiduciary' one within the meaning of § 523(a)(4) is a question of federal law." *In re Nail,* 680 F.3d 1036, 1039 (8th Cir 2012) (quotation omitted).  Under federal common law, "it is universally agreed that when a corporation approaches insolvency or actually becomes insolvent, directors' fiduciary duties expand to include general creditors," which is beyond the fiduciary duties that are due to the corporation and its shareholders. *In re Kingston Square Assoc.,* 214 B.R. 713, 735 (Bankr. S.D.N.Y. 1997).

Not all relationships to which "trust" status may be attributed under state law, or from which obligations of a fiduciary nature may be judicially imputed under state law, will qualify. *Hunter v. Philpott,* 373 F.3d at 876; *In re Cochrane,* 124 F.3d at 984; *In re Shahrokhi,* 266 B.R. at 707. The fiduciary requirement is not satisfied by basic facts that would merit the imposition of a constructive trust after an act of wrongdoing, under nonbankruptcy law. *Hunter v. Philpott,* 373 F.3d at 877; *In re Long,* 774 F.2d at 878.

"Missouri law is clear that officers and directors of public and closely held corporations are fiduciaries because they occupy positions of the highest trust and confidence and are required to exercise the utmost good faith when using the powers conferred upon them to both the corporation and their shareholders." *Western Blue Print Co., LLC v. Roberts,* 367 S.W.3d 7, 15 (Mo. 2012) (citations omitted).  "Missouri has rejected the concept that corporate directors are fiduciaries for

creditors, even in the event of insolvency, and has held that directors are not individually liable to creditors, absent statutory authority or an intentional or fraudulent act." *Drummond Co. v. St. Louis Coke & Foundry Supply Co.,* 181 S.W.3d 99, 104 (Mo. App. 2005) (citations omitted). Any transfer made which defrauds creditors is governed by the Uniform Fraudulent Transfer Act which ultimately declares any fraudulent transfer to be void, but does not state that corporate directors or officers are fiduciaries for the insolvent company's creditors and/or are personally liable to the insolvent company's creditors. *Id.*

A debtor's fraudulent intent for purposes of Section 523(a)(4) may be, and often must be, shown by circumstantial evidence. *See Kruse v. Murray (In re Murray),* 408 B.R. 268, 275 (Bankr. W.D. Mo. 2009) (citation omitted). An element of scienter is required to prove that a debtor's defalcations committed in breach of a fiduciary duty warrant exception from discharge. For a defalcation to occur within the scope of Section 523(a)(4), "a culpable state of mind" is required wherein the debtor has "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock v. BankChampaign, N.A.,* 133 S.Ct. 1754, 1756, 185 L.Ed.2d 922 (2013). "[W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, [defalcation] requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that criminal law often treats as the equivalent." *Id.* at 1759. "Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.* (emphasis in original). Exceptions to discharge under Section 523(a)(4) are construed narrowly and therefore the burden lies with the creditor opposing discharge. *In re Thompson,* 686 F.3d. at 944 (citing *In re Nail,* 680 F.3d at 1039).

The Court has not been presented with any express document in which Ms. Keogh's specific fiduciary duties are strictly defined. Fleming has submitted a copy of its Employee Handbook, as

-21-

well as an employment contract for Ms. Keogh when she was a Sales Person.  There can be no reasonable dispute that the employment contract of record does not specifically enumerate the extent of Ms. Keogh's fiduciary duties as President of Fleming.

Nevertheless, the Court concludes that a technical trust existed between Ms. Keogh and Fleming, and fiduciary duties flowed from Ms. Keogh to Fleming for her to operate Fleming honestly, maintain records, and to exercise her business judgment in good faith.  These duties necessarily required Ms. Keogh to avoid any occasion of self-dealing, especially on the eve of bankruptcy.  The record makes clear that Ms. Keogh operated Fleming in breach of her fiduciary duties to Fleming throughout the calendar year of 2003, which is within one year of Fleming's Chapter 11 filing.  Such acts in breach of her fiduciary duties caused a defalcation to the detriment of Fleming.  Such actions include causing salaries or other payment by Fleming for work that was not performed to Ms. Cunningham, Son Stephen and Mr. Keogh.

Specifically, the defalcations comprise all payments to Ms. Cunningham for work she did not perform, all payments to Son Stephen for work he did not perform, all payments to Mr. Keogh for work he did not perform, particularly the funds paid either directly to Mr. Keogh or indirectly to another member of the Keogh family in the amount of $480.00 to clean Fleming despite Mr. Keogh's failure to perform these cleaning duties, and all sporadic commissions paid either directly to Ms. Keogh or indirectly to another member of the Keogh family, in varied amounts, which Ms. Keogh has not demonstrated she was entitled to.

The Court does not accept Ms. Keogh's testimony that the funds paid to Ms. Cunningham were for work performed or were for maternity leave because the totality of the evidence is to the contrary.  Ms. Cunningham was paid various amounts based on fallacious time sheets that Ms. Keogh either wrote herself or authorized.  Ms. Keogh did not offer any evidence or testimony for the Court to make any contrary finding or conclusion as to the funds received by Son Stephen, and the Court's conclusions concerning Mr. Keogh's cleaning services are based on Debtors'

-22-

admissions.    Ms. Keogh had good intentions with regards to the $10,000.00 and $8,000.00 loans she obtained from her father, Mr. Kamler, to pay Fleming's payroll and IRS debt respectively.  Ms. Keogh's intentions however do not justify the excessive "interest" payments that Ms. Keogh caused to be made to Mr. Kamler merely twenty-five (25) days after the $10,000.00 loan was made. Moreover, Ms. Keogh's inclination to substantially repay her father, before Fleming's other creditors, is understandable, but nonetheless was an action taken in breach of her fiduciary duties to Fleming. Ms. Keogh's actions are also in breach of her fiduciary duties to Fleming's creditors because Fleming was in the zone of insolvency.  In any event, Ms. Keogh's self-dealing and the fraud she committed and/or endorsed in favor of her family members contributed to the circumstances that caused Fleming to need additional funds.  Fleming's dire financial straits were in part caused by Ms. Keogh's decision to pay various family members for work they did not perform, as well as Ms. Keogh's decision to siphon funds in varied amounts at sporadic times for her own use.  Further, Ms. Keogh's accounting of Fleming's finances are woefully inadequate such that tracing her actions proves to be a daunting task for anyone, this Court included.

So too, as will be discussed more extensively below in this Court's discussion on embezzlement, Ms. Keogh's sporadic and random commission payments to herself constitutes a breach of Ms. Keogh's fiduciary duties and constitute a defalcation.  This includes all payments or attempts to assign these funds to Daughter MacKenzie, all funds she sent Mr. Ungar to retrieve from the bank which remain unaccounted and, all excess funds that Ms. Keogh put into Debtors' personal bank account for which there remains no traceable use of those funds for Fleming's benefit.

Ms. Keogh actions demonstrate a culpable state of mind.  The Court draws this conclusion from the irregularities in timing, amount and payee of the alleged commissions, to the inclusion of the commissions that were paid to Daughter Mackenzie and those paid to Daughter Mackenzie's boyfriend Jason Pfeiffer.  Ms. Keogh's culpable state of mind is also illustrated by her failure to

-23-

account for excess funds that she caused to be withdrawn from Fleming's accounts.  In addition to an utter lack of accounting or documentation of these financial transactions, there appears to be deliberate attempts to hide her self-dealing through repetitive use of cash payments and multiple checks to pay for various transactions.  Ms. Keogh also omitted certain family members from Fleming's employee rosters or payroll registers, though she hired and caused those individuals to be paid.  By a preponderance of the evidence, Fleming has proven that Ms. Keogh's conduct was grossly reckless and she exposed Fleming to a substantial and unjustifiable risk in violation of her fiduciary duties and therefore the commensurate debt for the same constitutes a defalcation that will be excepted from discharge as to Ms. Keogh only.

<u>Embezzlement</u>

Embezzlement is the "fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Phillips,* 882 F.2d 302, 304 (8th Cir.1989) (quoting *In re Belfry,* 862 F.2d 661, 662 (8th Cir.1988) (internal brackets and quotation marks omitted)).  "To show embezzlement, the creditor has to prove that it entrusted its property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *Hamilton v. Green (In re Green),* 2012 WL 3028462 at *4 (Bankr. W.D. Mo.2012) (slip copy) (citation omitted).  "A plaintiff must establish that the debtor was not lawfully entitled to use the funds for the purposes for which they were in fact used." *In re Belfry,* 862 F.2d at 662.

Ms. Keogh caused Fleming funds to be placed into Debtors' bank account in undisclosed and unaccounted amounts which remain unknown to Fleming.  There were several withdrawals made to cash which Ms. Keogh cannot account for.  The Court accepts that funds which Ms. Keogh alleges to have used for payroll were in fact used for that purpose.  The issue becomes that there is yet to be an accounting for the cash she caused to be withdrawn from Fleming's account in excess of that required for payroll.  Further, Ms. Keogh's explanation that Fleming funds were put

-24-

into her personal account in an attempt to defraud the IRS is curious at best and does not explain why there is no similar trace of use of those funds for Fleming's business purposes.

It became quite clear to the Court that Fleming operated at the will of Ms. Keogh, with little guidance or assistance from Eagle. Ms. Keogh, for years, continued to manage and operate Fleming in a manner that satisfied the immediate needs of Fleming and Eagle. So long as these temporal needs were met, Ms. Keogh was left to her unfettered discretion. The record is equally clear that Ms. Keogh became disgruntled because she felt that she was rendered incapable of operating Fleming without interference due to Fleming's financial responsibilities to Eagle and creditors, particularly Fleming's former owner Bill Fleming. Ms. Keogh consulted herself and determined that it was time that she be compensated for her years of service under these seemingly oppressive circumstances. In the process, she made sure Son Stephen was given a salary from Fleming of $8.00 per hour plus overtime, irrespective of whether he performed any work for that salary. Ms. Keogh likewise ensured that Ms. Cunningham received enough money to take care of Debtors' grandson in that Ms. Cunningham received a salary from Fleming, irrespective of whether Ms. Cunning actually performed any work, or, whether her salary reflected the amount of work actually performed. Likewise, Mr. Keogh was paid regardless of whether Fleming was cleaned.

In that same vain, Ms. Keogh believed that she was entitled to more than her annual salary of $100,000.00 for all she did to operate Fleming, especially relative to the funds she was required to cause Fleming to funnel to Eagle and to Bill Fleming. With this harbored resentment, Ms. Keogh took what she viewed as her opportunity, without any consideration for accounting, formalities, record keeping or legality. While true that one cannot embezzle one's own money, here, the Court cannot conclude that Ms. Keogh was entitled to any of the commissions she took directly or under the guise of some other purpose, or caused to be taken through Daughter MacKenzie. Ms. Keogh has not demonstrated to this Court that she was entitled to those sporadic and varied commissions.

The culmination of the above compels the conclusion that by a preponderance of the evidence, Fleming has met its burden that the debt owed by Ms. Keogh for funds she caused to be diverted to herself in either commissions or unaccounted excessive cash withdrawals were embezzled within the meaning of Section 523(a)(4).   Therefore Fleming is entitled to have the debt for funds embezzled by Ms. Keogh excepted from discharge.

Larceny

Larceny is "[t]he unlawful taking and carrying away of someone else's personal property with the intent to deprive the possessor of it permanently."  Black's Law Dictionary 959 (9th ed. 2009). "The essential difference between larceny and embezzlement is the manner in which property comes into the possession of the person charged.  Embezzlement involves a lawful or authorized possession. In the case of larceny, however, the original taking and possession is unlawful." *Rech v. Burgess (Matter of Burgess),* 106 B.R. 612, 622 (Bankr. D. Neb. 1989).

The Court here concludes that the several technical drawings, as well as the Lomega External Hard Drives, were unlawfully taken from Fleming by Ms. Keogh.  Ms. Keogh intended to deprive Fleming of its proprietary property and sweat equity.  This is further exemplified by Ms. Keogh's action to remove "Fleming" from several printed technical drawings and superimpose "IMC" on the same.  Ms. Keogh however did not change the Fleming catalogue numbers which are also on the technical drawings, therefore, there is no dispute that the recovered technical drawings were indeed Fleming's property.[41]   There is insufficient evidence as to Ms. Keogh's use of Fleming's customer list and therefore the Court does not make any determination about any corresponding debt. By a preponderance of the evidence, Fleming has demonstrated that the debt, for the larceny

---

[41]The Court acknowledges that because there is a concern about the chain of title, any recovered technical drawings that were placed into the possession of Mr. Levy then returned to the police will be given due consideration in the discussion on damages below.

of misappropriating Fleming's drawings, both in electronic copy and hard copy, will be excepted from discharge.

The Court was not given adequate evidence as to the value of Fleming's drawings. The Court will consider Mr. Levy's testimony as to the production costs for each mold product, as well as what Mr. Levy believes a willing buyer would pay for Fleming's catalogue of drawings in the discussion on damages below. Therefore, the relief requested under Count III will be granted in part as to Ms. Keogh only.

**COUNT IV - 523(a)(6)**

Debts arising from willful and malicious injury by a debtor are excepted from discharge under Section 523(a)(6). 11 U.S.C. § 523(a)(6) (2012). "The bankruptcy court's determination of whether a party acted willfully and maliciously inherently involves inquiry into and finding of intent, which is a question of fact." *In re Fors,* 259 B.R. 131, 135 (B.A.P. 8th Cir. 2001) (citing *Waugh v. Eldridge (In re Waugh),* 95 F.3d 706, 710 (8th Cir. 1996)). Willfulness and maliciousness are two distinct elements of Section 523(a)(6). *In re Patch,* 526 F.3d 1176, 1180 (8th Cir. 2008) (citing *Fischer v. Scarborough (In re Scarborough),* 171 F.3d 638, 641(8th Cir. 1999), *cert. denied,* 528 U.S. 931, 120 S.Ct. 330, 145 L.Ed.2d 258 (1999)). The Eighth Circuit Court of Appeals has set a high bar for certainty of harm regarding willful and maliciousness for the purposes of Section 523(a)(6). *In re Adams*, 349 B.R. 199, 203 (Bankr. W.D. Mo. 2006) (citing *In re Hartley,* 869 F.2d 394, 394 (8th Cir. 1989) (citations omitted)).

To prove willfulness, the creditor must show by a preponderance of the evidence that debtor intended the injury, not just a deliberate or intentional act leading to injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998); *Grogan v. Garner,* 498 U.S. 279, 280, 111 S.Ct. 654, 655, 112 L.Ed.2d 755 (1991). "If the debtor knows that the consequences are certain, or substantially certain, to result from his conduct, the debtor is treated as if he had, in fact, desired to produce those consequences." *In re Patch,* 526 F.3d at 1180. "The word 'willful' in (a)(6)

modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. at 61, 118 S.Ct. at 977 (emphasis in original).  Debts arising from recklessly or negligently inflicted injuries do not fall within the compass of Section 523(a)(6). *Kawaauhau*, 523 U.S. at 64, 118 S.Ct. at 978.

To prove malice, the creditor must prove debtor's conduct was specifically targeted at the creditor and was certain or almost certain to cause financial harm. *In re Madsen*, 195 F.3d 988, 989 (8th Cir. 1999) (citing *In re Long*, 774 F.2d at 881); *American Bank of Raytown v. McCune (In re McCune)*, 85 B.R. 834, 836 (Bankr. W.D. Mo. 1988).  "A wrongful act is malicious if . . . there exists a 'knowing wrongfulness or knowing disregard for the rights of another.'" *In re Fors*, 259 B.R. at 137 (citing *Erickson v. Roehrich (In re Roehrich)*, 169 B.R. 941, 945 (Bankr. D.N.D. 1994)). "An act may be found to be malicious even in the absence of a specific, subjective intent to injure." *Id.*  The conduct must "be more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from mere legal rights.  Moreover, knowledge that legal rights are being violated is insufficient to establish malice, absent some additional 'aggravated circumstances'...." *First Federal Bank v. Mulder (In re Mulder)*, 306 B.R. 265, 270 (Bankr. N.D. Iowa 2004) (citation omitted).

There is sufficient evidence that Ms. Keogh's conduct was indeed willful.  She caused her family members and Ms. Cunningham to be hired and receive salaries or other payment irrespective of whether those individuals performed services to the benefit of Fleming, and she caused commissions to be issued to herself.  Further, Ms. Keogh caused electronic and hard copies of Fleming's technical drawings to be misappropriated and used at Innovative and IMC.  These actions were willful in that they were certain to harm Fleming.

This Court, however, does not conclude that Ms. Keogh's actions were malicious.  Ms. Keogh's inappropriate, fraudulent and illegal actions have been detailed above and will not be

repeated here.  But, this Court also considers Ms. Keogh's action to seek loans from Mr. Kamler to meet Fleming's financial obligations and her efforts to keep Fleming afloat.  The culmination of Ms. Keogh's highly problematic actions preclude this Court from concluding that Ms. Keogh acted maliciously.  Therefore, the relief requested under Count IV must be denied.

**COUNT V - No Discharge Under 727(a)(3)**

Count V sought revocation of Debtors' discharge.  Denial of a debtor's discharge is a harsh penalty and as such, Section 727 is to be strictly construed in favor of the debtor.  *In re Korte,* 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001) (citations omitted).  The objecting party must prove each element of a Section 727 objection to discharge by a preponderance of the evidence.  *In re Sendecky,* 283 B.R. 760, 763 (B.A.P. 8th Cir. 2002) (citations omitted).

Section 727(a)(3) states that a discharge shall not be granted if

> [d]ebtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. 727(a)(3) (2012).

Fleming has not presented any evidence or witnesses to support the allegation that Debtors have failed to turn over records concerning Debtors' financial condition.  Fleming's voluminous pleadings as well as the trial testimony are silent as to any basis to revoke Debtors' discharge.  It also appears that in closing argument Fleming attempted to withdraw Count V.  In any event, without further discussion, the relief requested as to Count V will be denied.

**DAMAGES**

At the outset, the Court acknowledges that Fleming filed its Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code on January 30, 2004 in the Southern District of Florida.  There is no dispute that Ms. Keogh constitutes a insider in that she was President of Fleming prior

to the Chapter 11 filing.  Ms. Keogh's fiduciary duties have already been discussed which, for purposes of this damages calculation, were indeed heightened in the one (1) year period before Fleming's bankruptcy filing. *Cf.* 11 U.S.C. § 547(b) (2012);  *In re Kingston Square Assoc.,* 214 B.R. at 735.  Fleming's requested damages are in large part limited to actions taken by Ms. Keogh during the one year period immediately preceding Fleming's Chapter 11 filing.

Fleming requests $15,838.65 in damages for funds paid to Ms. Cunningham which includes sums that are accounted for in Fleming's other damages request.  Upon the Court's review of Exhibit 19, only $14,751.35 constitutes draws from Fleming accounts payable to Ms. Cunningham.[42]  Based on Ms. Cunningham's credible and reliable testimony, the Court will likewise make a 25% reduction in this amount requested to account for work actually performed by Ms. Cunningham. Ms. Cunningham did testify that she barely worked at Fleming in January 2003, did not work at all in February 2003 but returned to Fleming towards the end of March 2003 and then worked full-time in the summer of 2003.  The Court concludes that it would be improper not to account for this testimony, however, any attempt to more firmly define Ms. Cunningham's actual work hours would be futile.  Likewise, the Court recognizes that some funds which purport to be wages might have been paid to Ms. Cunningham in cash or from accounts that are not Fleming accounts, however, those sums were not included in this calculation.  Specifically, checks paid directly from Debtors' personal account to Ms. Cunningham were not included in this calculation.  Therefore, the damages caused by Ms. Keogh through excess payments to Ms. Cunningham will be 75% of the $14,751.35 paid to Ms. Cunningham from Fleming accounts in 2003, which is $11,063.51.

---

[42]The Court did not include Check Number 51688 in the amount of $344.00 because this Check is dated January 8, 2002 and there was no testimony about Ms. Cunningham's services in January 2002. Check Number 37912 in the amount of $602.50 was included because this Check was paid to Jennifer Cunningham though there is a notation that the Check is "for Stephen Keogh."  Check Number 807 dated September 24, 2003 in the amount of $423.30 as well as Check Number 540 dated October 31, 2003 in the amount of $320.00 from Debtors' personal bank account were not included because the Court cannot conclude with certainty that these funds were for wages and because these funds are accounted for below.

Fleming submits that $26,423.02 reflects all funds received by Son Stephen from Fleming from January 17, 2003 through January 10, 2007 which included sums that are also accounted for in Fleming's other damages request. Upon the Court's review of Exhibit 17, only $22,328.02[43] constitutes draws from Fleming accounts payable to Son Stephen in 2003. In equity, the Court will make a 20% reduction in this amount for work actually performed by Son Stephen. The Court acknowledges that Son Stephen was not included on various employee lists, however, he did perform some tasks at Fleming, albeit that those tasks and the actual time spent performing those tasks are uncertain. It is also possible that other funds that were actually received by other parties were ultimately paid to Son Stephen and those funds are accounted for below. Therefore the damages caused by Ms. Keogh through excess payments to Son Stephen will be 80% of $22,328.02 or $17,862.42.

Fleming requests $7,039.73 in damages for funds paid to Mr. Keogh which includes funds that were actually paid to other members of the Keogh family. Upon the Court's review, $6,999.73 was paid directly to Mr. Keogh from Fleming accounts. Despite Mr. Keogh's failure to claim these funds as income on his joint income tax return, all agree that he did perform some driving services and truck maintenance services on behalf of Fleming. The Court does not accept that Mr. Keogh performed the cleaning services for which he was paid nor does the Court accept that any such contract actually existed. On this basis, the Court will make an adjustment for all funds received for cleaning services, which upon the Court's review is eight (8) payments of $480.00, or $3,840.00, and award damages in that amount. Therefore, the damages caused by Ms. Keogh through excess payments to Mr. Keogh will be $3,840.00.

---

[43]Check Number 587 dated October 24, 2003 in the amount of $602.50 and Check Number 541 dated October 31, 2003 in the amount of $602.50 from Debtors' personal account were not included in this calculation.

Fleming alleges damages in the amount of $11,700.00 for preference payments to Mr. Kamler. There is no dispute that Mr. Kamler issued Check Number 9688 in the amount of $5,000.00 to Fleming and Check Number 9689 in the amount of $5,000.00 to Fleming, in a total amount of $10,000.00; both Checks are dated April 4, 2003. Also, on September 3, 2003, Mr. Kamler issued Check Number 3992 in the amount of $8,000.00 to the IRS on behalf of Fleming. Ms. Keogh also caused $11,700.00 to be paid to Mr. Kamler in 2003 and testified that these funds constituted repayment of loans or interest on loans. Ms. Keogh's action to cause repayment to her father ahead of Fleming's other unsecured creditors speaks to Ms. Keogh's overall breach of fiduciary duties, however, this particular action and the associated funds cannot properly be deemed to have damaged Fleming. Fleming had the option to seek appropriate remedies against Mr. Kamler in Fleming's Chapter 11 proceeding but chose not to do so, albeit for valid reasons. Because Fleming has not demonstrated how the funds paid to Mr. Kamler constitutes an embezzlement or a fraud or defalcation, to the inclusion of the requisite scienter, the requested $11,700.00 will not be included in the judgment.

As stated above, there is no basis for this Court to conclude that Ms. Keogh was entitled to commissions. Further, Ms. Keogh has failed to substantiate her claim to commissions with any evidence or testimony about the scope of these commissions, for example, the amount or how the commissions were to be calculated or when the commissions were to be disbursed. Therefore, Fleming is entitled to all funds that were caused to be paid for commissions to which Ms. Keogh was not entitled. Upon this Court's review, this includes Check Number 37169 in the amount of $14,800.00 dated July 23, 2003, $3,000.00 of Eagle Check Number 132 which was paid in the total amount $14,158.53, of which the Court believes $11,158.53 was distributed for payroll, Check Number 37914 in the amount of $3,000.00 dated June 27, 2003 and Check Number 37998 in the amount of $2,500.00 dated July 9, 2003 for a total of $23,300.00.

The Court also concludes that the debt owed by Ms. Keogh to Fleming also includes all funds which neither Fleming nor this Court can trace to a legitimate business purpose, and, that Ms. Keogh did not even attempt to trace. This includes $25,000.00 of Check Number 37552 which was never received by Bank of Sullivan as alleged by Ms. Keogh, and remains unaccounted for beyond that at some point Ms. Keogh held these funds in cash, $8,000.00 for Check Number 37090 dated October 21, 2003 which Ms. Keogh alleged to use for payment due to the IRS however this Court's review of the Fleming IRS transcripts reflects no corresponding payment received and therefore remains unaccounted, Check Number 37712 dated May 16, 2003 in the amount of $480.00 paid to Daughter Mackenzie for Mr. Keogh, Check Number 37460 in the amount of $6,000.00 dated October 24, 2003, Check Number 37231 in the amount of $1,500.00 dated July 30, 2003, Check Number 36699 in the amount of $1,500.00 dated November 4, 2003, Check Number 38250 in the amount of $600.00 dated November 7, 2003, Check Number 37399 in the amount of $1,500.00 dated August 18, 2003, Check Number 38278 of which $922.50 was caused to be paid to Mr. Ungar for Son Stephen and Ms. Cunningham, Check Number 38255 of which $602.50 was caused to be paid to Mr. Ungar for Son Stephen and Check Number 38045 of which $602.50 was caused to be paid to Daugther MacKenzie for Son Stephen.[44] The total amount of these diversions $46,707.50 which will be added to the judgment.

As and for Ms. Keogh's larceny of taking the printed and electronic copies of Fleming's technical drawings, Mr. Levy testified that he estimates a production cost of $4,000.00 per mold product based on three (3) to four (4) weeks of production at $1000.00 per week. Mr. Levy's uncontroverted testimony is that the Lomega's contained 1398 mold products when misappropriated by Ms. Keogh and therefore, the total production cost equates to damages of $5,592,000.00. Mr. Levy also testified that he believes a willing buyer would have paid $750,000.00

---

[44] The Court excludes Check Number 37797 in the amount of $10,000.00 dated June 6, 2003 because the Court concludes these funds were used for payroll.

for the mold products at the time of Ms. Keogh's misappropriation. Mr. Ungar testified that it would take him more than his lifetime to reproduce the drawings that were misappropriated by Ms. Keogh. On Fleming's Schedule B, it listed its Drawings/Blueprints/Trade Secrets and Equipment at a value of $1,000,000.00 on Line 21. Ms. Keogh testified that she believes the drawings are worthless.

The Court is now faced with the daunting task of valuing the paper and electronic drawings that were misappropriated by Ms. Keogh. The Court has no evidentiary basis to conclude what the value of these drawings is, one way or the other. There was no expert witness as to value. Further, Fleming has not submitted sufficient evidence of loss profits or how much Ms. Keogh and Innovative or IMC were able to benefit through the misappropriation of Fleming's technical drawings. The Court however does not accept Ms. Keough's representation that these drawings are worthless. If that were the case, she would not have misappropriated these drawings, nor would she have sought to create Innovative or IMC using Fleming's drawings.

The uncontroverted testimony of Mr. Levy is that Ms. Keogh took 1398 mold products, each of which consists of several engineered drawings. The Court will therefore award nominal damages of $50.00 per mold product, for a total award of $69,900.00 for the electronic copies of the drawings. The Court will award an additional $100.00 for the printed copies of the drawings that were maintained by the Cuba police. While the Court does not suspect Mr. Levy of any ill-doing, the Court will award $1.00 for the drawings recovered under replevin due to potential issues with the chain of title. Therefore, Fleming will be awarded $70,001.00 for the technical drawings, both electronic and printed.

As a Court of equity, the above damages calculation reflects this Court's attempt to award a judgment that is commensurate with Ms. Keogh's wrong doing, the effect of her poor record-keeping and the actual losses to Fleming. Therefore, by separate order, $172,774.43 will be awarded to Fleming.

The Court further notes that during closing argument, Fleming argued that Mr. Keogh benefitted from all of Ms. Keogh's bad acts and therefore, the debt should be deemed nondischargeable as to Mr. Keogh as well.  A blanket assertion as to Mr. Keogh's involvement is insufficient to meet Fleming's burden that Mr. Keogh acted in concert or collusion with Ms. Keogh. The Court therefore will deem these amounts nondischargeable as to Ms. Keogh only.

**TAXATION OF COSTS**

Fleming requests that the costs to depose Ms. Keogh in the amount of $1,021.20 be taxed as court costs under Missouri Statute Section 492.590 which states:

> The costs and expenses of depositions, whether originals or copies, or related court reporter, notarial, or other fees of recording the same, shall be awarded as a judgment in favor of the party or parties requesting the same, and collected in the manner provided by section 514.460.[45] Any party incurring any such costs or expenses may request the taxing of such costs or expenses actually incurred by that party whether or not such depositions were taken at the instance of that party or some other party to the suit or suits, provided, however, that any judgment awarded for copies of depositions shall be limited to the cost of one copy per party, except upon leave of court.

Mo. Rev. Stat. § 492.590.1 (2012).  Section 1920 of Title 28 states that a judge of any court of the United States may tax as costs the "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case" and that any such award should be included in the judgment or decree. 28 U.S.C. § 1920(2) (2012).

Rule 54(d)(1) of the Federal Rules of Civil Procedure, as made applicable in Bankruptcy Proceedings by Federal Rule of Bankruptcy Procedure 7054 states that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs – other than attorney's fees – should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1) (2012); Fed. R. Bankr. P. 7054 (2012).  "A Court has the discretion in determining and awarding costs in a given case." *MEMC Electronic*

---

[45]Missouri Statute Section 514.460 is now Missouri Statute Section 488.432.

*Materials, Inc. v. Sunlight Group, Inc.,* 2012 WL 918743 *1(E.D. Mo. 2012) (citing *Pershern v. Fiatallis N. Am., Inc.,* 834 F.2d 136, 140 (8th Cir. 1987)).   Section 1920(2) of Title 28 permits taxation of costs for either printed or electronically recorded transcripts, not both.  *American Guarantee & Liability Insurance Company v. U.S. Fidelity & Guaranty Company,* 2010 WL 1935998 *2 (E.D. Mo. 2010).   Only that which is specifically detailed in Section 1920(2) of Title 28 is recoverable. *Id.* The Court should carefully scrutinize any bill of costs. *Koppinger v. Cullen-Schiltz and Associates,* 513 F.2d 901, 911 (8th Cir. 1975).

As the prevailing party, Fleming is entitled to have its costs taxed to Ms. Keogh, however, such taxation is in accordance with federal law.   The deposition expenses of $1,021.20 in accordance with 28 U.S.C. Section 1920(2) will be taxed.

**ATTORNEYS FEES**

Rule 54(d)(2) of the Federal Rules of Civil Procedure, as made applicable in Bankruptcy Proceedings by Federal Rule of Bankruptcy Procedure 7054 provides that a motion for attorney's fees and related nontaxable expenses may be made unless "substantive law requires those fees to be proved at trial as an element of damages." Fed. R. Civ. P. 54(d)(2)(A) (2012); Fed. R. Bankr. P. 7054 (2012).  Any motion for attorneys fees must specify the grounds that entitle the movant to the award.   Fed. R. Civ. P. 54(d)(2)(B)(ii) (2012); Fed. R. Bankr. P. 7054 (2012).  Any exception from discharge of a debt under Section 523(a) may include attorney's fees and costs in that the same constitutes "any debt" that arises from the misconduct. *Cohen v. de la Cruz,* 523 U.S. 213, 213-14, 118 S.Ct. 1212, 1214, 140 L.Ed.2d 341(1998).

"[N]ormally, attorney's fees are not awarded, absent clear statutory authority or unusual circumstances." *U.S. v. Mexico Feed and Seed Co., Inc.,* 980 F.2d 478, 490 (8th Cir. 1992) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 249–50, 95 S.Ct. 1612, 1617–18, 44 L.Ed.2d 141 (1975)).  "In the United States the parties to litigation generally bear the cost of their own attorney's fees.  Under this 'American Rule' it is improper to award attorney's fees incurred in

-36-

litigation unless the right to such fees is set by statute or awarded by contract." *Seimer v. Nangle (In re Nangle),* 281 B.R. 654, 657 (B.A.P. 8th Cir. 2002) (emphasis in original) (citations omitted).

Fleming's request for attorneys fees does not state any grounds for which it is entitled to attorney's fees.  Therefore, the Court is not presented with basis to depart from the American Rule. The request for attorneys fees will be denied.

By separate Order, judgment in the total amount of $173,795.63 will be entered against Ms. Keogh and declared nondischargeable.

_Kathy A. Surratt-States_
KATHY A. SURRATT-STATES
Chief United States Bankruptcy Judge

Dated: April 30, 2014
St. Louis, Missouri

Copies to:

Office of the United States Trustee
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Suite 6.353
St. Louis, MO  63102

David L. Baylard
Baylard, Billington & Dempsey, PC
30 South McKinley
Union, MO 63084

Fleming Manufacturing Company, Inc.
219 Beamer Lane
Cuba, MO 65453

A. Thomas DeWoskin
Danna McKitrick, PC
7701 Forsyth, Suite 800
St. Louis, MO 63105

Harold and Debra Keogh
1130 Fleenor Road
Cuba, MO 65453

Daniel E Leslie
Leslie Spieler & Fulford LLC
1 South Oak Street
Union, MO 63084